CAMACHO CALVO LAW GROUP LLC

GERI E. DIAZ
gdiaz@camachocalvo.law
134 W. Soledad Ave., Suite 401
Hagåtña, Guam 96910
Telephone No. 671.472.6813
Facsimile No. 671.477.4375

Attorney for Defendant
NISSAN MOTOR CORPORATION IN GUAM

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| NATHANIEL UNTALAN,<br><br>             Plaintiff,<br><br>    vs.<br><br>NISSAN MOTOR CORPORATION IN GUAM,<br><br>             Defendant. | CIVIL CASE NO. CV18-00015<br><br><br>**MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CERTIFICATE OF SERVICE** |

i.

061832-00004

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................................ 1

II.  FACTUAL BACKGROUND.............................................................................................. 1

III. SUMMARY JUDGMENT STANDARD ............................................................................. 2

IV.  LEGAL ARGUMENT ....................................................................................................... 3

   A.  Plaintiff's Complaint ......................................................................................................... 3

   B.  Nissan is Entitled to Partial Summary Judgment Because There Was No Violation Of
       Guam's Fair Labor Standards Act...................................................................................... 3

       1. Guam's Fair Labor Standards Act.................................................................................. 3

       2. Plaintiff Was Employed As A Bona fide Executive Employee ....................................... 4

       3. Plaintiff Was Paid On A Salary Basis Of Not Less Than $455 Per Week ..................... 8

   C.  Nissan Is Entitled To Summary Judgment Because It Did Not Wilfully Or Recklessly
       Withhold Employer Contributions Into Plaintiff's 401K Plan........................................... 12

   D.  Nissan is Entitled to Summary Judgment On The Claim that Plaintiff Is Entitled To
       Reimbursement For Medical And Dental Premiums For The Period of June 1, 2017 to July
       31, 2017 ........................................................................................................................... 16

V.   CONCLUSION ................................................................................................................. 18

061832-00004

## <u>CASES</u>

Beard v. Banks,
   548 U.S. 521 (2006) ............................................................................................................ 2

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) ............................................................................................................ 2

Fink v. City of New York,
   129 F.Supp.2d 511 (E.D.N.Y. 2001) ............................................................................... 14

Fryer v. A.S.A.P. Fire & Safety Corp., Inc.,
   658 F.3d 85 (1st Cir. 2011) .............................................................................................. 15

Lujan v. Nat'l Wildlife Fed'n,
   497 U.S. 871 (1990) ............................................................................................................ 2

Ortiz v. Lopez,
   688 F.Supp.2d 1072 (E.D. Ca. 2010) ................................................................................ 3

Paxton v. City of Montebello,
   712 F.Supp.2d 1017 (C.D. Cal. 2010) ............................................................................. 14

Reed v. Honeywell Int'l. Inc.,
   2009 WL 886844 ........................................................................................................ 14, 15

Sanchez v. Puerto Rico Oil Co.,
   37 F.3d 712 (1st Cir.1994) .............................................................................................. 14

Satterfield v. Borough of Schuylkill Haven,
   12 F.Supp.2d 423 (E.D. Pa 1998) ................................................................................... 14

United States v. Sierra Pac. Indus.,
   879 F.Supp.2d 1096 (E.D. Cal. 2012) ............................................................................... 3

061832-00004

## STATUTES

22 G.C.A. § 3108(b) ................................................................................................................. 8

22 GCA § 3105 ...................................................................................................................... 4

22 GCA § 3108(b)(1) ............................................................................................................. 4

3 G.C.A. §3102(a) .................................................................................................................. 3

Fed. R. Civ. P. 56(a) .............................................................................................................. 2

G.C.A. § 3104 (c) and (d) ...................................................................................................... 3

061832-00004

Defendant Nissan Motor Corporation in Guam ("Nissan") moves the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. This motion is supported by the attached Memorandum of Points and Authorities, the Concise Statement of Material Facts, the attached Declarations of Rosalinda P. Nieva, Eugene Roberts, Arnel Bonto and E.J. Quintanilla, Exhibits A through X, and the records and files for this case.

*Respectfully submitted*: Hagåtña, GU, June 12, 2019.

CAMACHO CALVO LAW GROUP LLC

*/s/ Geri E. Diaz*

GERI E. DIAZ
Attorney for Defendant
NISSAN MOTOR CORPORATION IN GUAM

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This case was filed by Plaintiff Nathaniel Untalan who claims that he was discriminated against and constructively discharged from employment with Nissan because he was a member of a uniformed service and had exercised his rights under USERRA. ECF No. 1, ¶ 55. As will be demonstrated below, Nissan is entitled to summary judgment on several of the claims raised by Plaintiff because of the undeniable evidence which establishes that he is unable to prove all the elements essential to legally support those claims.

### II. FACTUAL BACKGROUND

Plaintiff was initially employed by Nissan through Guam Community College's Co-Op program on July 3, 1997 as a Warehouse Person in the Parts Department. **Exhibit A.** Thereafter, he held other positions, including Parts Advisor effective June 11, 1998 (**Exhibit B**), Parts Counterperson effective November 16, 1999 (**Exhibit C**), Parts Advisor effective April 1, 2001

(**Exhibit D**), and Lead Parts Advisor effective April 1, 2003 (**Exhibit E**). The last position he held was Assistant Parts Manager effective April 1, 2007 (**Exhibit F**) through his resignation on September 7, 2017 (**Exhibit G**).

In October 2013, he notified Nissan of his enlistment into the Air Force Reserves. **Exhibit H.** Between the period of 2014 to September 2017, Nissan has been supportive of and has accommodated Plaintiff when he was on military orders.

Plaintiff now alleges that he was discriminated against because of his enlistment in the military and that he was forced out of the company due to wage and hour and USERRA violations. Nissan disputes these allegations as they are unfounded and now moves for Partial Summary Judgment of the issues alleged in the Complaint.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment is to isolate and terminate claims and defenses that are factually unsupported. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). Using depositions, affidavits or declarations, a party moving for summary judgment forces the opponent to come forward with sworn averments of fact essential to her claim before the time-consuming process of litigation and trial may continue. <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888-89 (1990). If the non-moving party cannot show a genuine dispute requiring a trial, entry of summary judgment in favor of the movant *shall* be granted. Fed. R. Civ. P. 56(a); <u>Beard v. Banks,</u> 548 U.S. 521, 529 (2006).

061832-00004

## IV. LEGAL ARGUMENT

### A. Plaintiff's Complaint

"It is well-established that 'the issues on summary judgment are framed by the complaint.'" United States v. Sierra Pac. Indus., 879 F.Supp.2d 1096, 1108 (E.D. Cal. 2012) (quoting Ortiz v. Lopez, 688 F.Supp.2d 1072, 1082 (E.D. Ca. 2010)).

The Complaint purports to state two main claims, namely, a violation of Guam's Fair Labor Standards Act (Count 1) and a violation of USERRA (Count 2). ECF No 1. Nissan is entitled to summary judgment on several of Plaintiff's claims because there is no evidence to establish that it violated Guam's Fair Labor Standards Act, that it willfully and recklessly withheld employer contributions into his 401K plan, and that Plaintiff is entitled to reimbursement for medical and dental premiums for the period of June 1, 2017 through July 31, 2017.

### B. Nissan is Entitled to Partial Summary Judgment Because There Was No Violation Of Guam's Fair Labor Standards Act

#### 1. Guam's Fair Labor Standards Act

Guam's Fair Labor Standards Act applies to every employer (with the exception of the United States Government) and every employee (with the exception of agricultural employees for any workweek in which the employer employs less than 10 persons, and domestic workers). 3 G.C.A. § 3104 (c) and (d).

The Minimum Wage and Hour Act of Guam, which falls within the umbrella of the Guam Fair Labor Standards Act, was enacted to for several reasons, one of which is to establish minimum wage and maximum hour standards at levels consistent with public health, efficiency and the general well-being of workers. 3 G.C.A. §3102(a).

The Minimum Wage and Hour Act requires every employer to pay each person employed by him wages at a rate not less than Eight Dollars and Twenty-Five Cents ($8.25) per hour,

effective January 1, 2015. 22 GCA § 3105. The Act provides an exemption for employees employed as bona fide executive employees. Specifically, the Act states that § 3105 does not apply to:

> Any employee who is employed in a bona fide executive capacity, which is any employee who is compensated on a salary or fee basis at a rate of not less than Four Hundred Fifty-five Dollars ($455.00) per week and whose primary duty is management of the enterprise where the employee is employed or of a recognized department thereof; who customarily and regularly directs the work of two (2) or more other employees; and who has the authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.

22 GCA § 3108(b)(1). Accordingly, to be exempt from Guam's minimum wage and overtime standards, Plaintiff must meet the job duties test to qualify as an executive employee and be paid on a salary basis of not less than $455 per week.

### 2. Plaintiff Was Employed As A Bona fide Executive Employee

Pursuant to 22 GCA § 3105, an employee employed in a bona fide executive capacity manages the enterprise, customarily and regularly directs the work of two or more other employees, and has the authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, etc., is given particular weight.

Plaintiff was an Assistant Parts Manager and he held this position from 2007 (**Exhibit F**) to the September 7, 2017 when he resigned. **Exhibit G.** During his deposition, he provided testimony evidencing his managerial duties. He stated the following:

> Q:  What was the next job title that you held there?
> A:  Parts assistant manager.
> Q:  When did you get that job title?
> A:  I believe in 2007, ma'am, best guess.
> Q:  Okay. And did you hold that job title until you resigned in 2018?
> A:  '17
> Q:  2017, excuse me.

4

> A:      Yes, ma'am.
> Deposition of Nataniel Untalan ("Untalan depo.") at 17: 5-13.

As an Assistant Parts Manager, he had supervisory duties over the employees in the Parts Department.   He acknowledged that there were approximately 8 to 10 employees in that department and he directed them with regards to their job duties.   Specifically, he stated:

> Q:      In your own words, can you tell me exactly what your essential job duties were throughout the years that you held this job position.
> A:      Process special orders, handle customers, of course, work on stock orders, oversaw most of my parts advisors, monitor sales, keep an eye on telephones.
> Untalan depo. at 18: 4-9.
>
> Q:      How many people or how many employees were in the parts department?
> A:      We had approximately eight, ten.
> Untalan depo. at 18: 19-21.
>
> Q:      And so you said there were parts advisors?
> A:      Parts advisors.
> Q:      And what other titles were there?
> A:      Warehouse person.
> Q:      Okay. Anything else?
> A:      We had an inventory clerk off-island, an off-island inventory clerk.
> Q:      And you said that you oversaw parts advisors --
> A:      Yes, ma'am.
> Q:      -- correct?  Did you also oversee the warehouse person?
> A:      Yes.
> Q:      And did you also oversee the inventory off-island clerk?
> A:      Yes.
> Untalan depo. at 18: 22-25; 19: 1-12.
>
> Q:      Okay. Did you direct them with regard to their job duties, meaning did you tell them what to do or did you show them how to do things, things of that nature that an assistant manager would do?
> A:      Yes.
> Q:      "Yes," okay.  Now, with regard to these individuals, did you have the authority to make any suggestions with regard to either promoting them or maybe demoting them or maybe recommending them for certain raises or anything of that nature?

A:      Officially or --

Q:      In your capacity as an assistant parts manager.

A:      As a manager, I can always take care of my people and talk to the parts manager or give him my opinion.

Q:      And make those recommendations?

A:      If he asks for it.

Q:      Okay. As an assistant parts manager, do you feel that your opinion regarding how an individual was doing was given a certain amount of weight?

A:      I would hope so.

Untalan depo. at 20: 4-25; 21: 1-6.

Q:      Have you had discussions [with the Parts Manager] before regarding promotions, demotions?

A:      When he asks my opinion.

Q:      So he will defer to you?

A:      He would ask, yes.

Untalan depo. at 21: 12-16.

Further evidence of Plaintiff's executive status is outlined in his job description as an Assistant Parts Manager.  His managerial and supervisory responsibilities included evaluating employee performance and identifying hiring and training needs; supervising and motivating the staff to perform their best; coaching and supporting new and existing employees; suggesting sales training programs and techniques; communicating with customers and evaluating their needs; handling complaints from customers, etc. **Exhibit I.**

During Plaintiff's deposition, he reviewed the Assistant Parts Manager Job Description (**Exhibit I**) and confirmed that the essential duties and supervisory responsibilities listed on the form were correct and that he performed those functions. Untalan depo. at 23: 12-25; 24: 1-3.

Plaintiff's job duties also included conducting performance reviews of those employees that he supervised.  He stated:

Q:      One of the things that I wanted to also follow up on is when we were talking about your job duties and your job description, did that also include doing

performance reviews for your parts advisors or anyone that you oversaw in the parts department?

A:    Yes, Ma'am.

Q:    So that was also part of your essential duties - -

A:    Yes.

Q:    - - to do the performance reviews?

A;    We split it in half.  It was me and the manager.

Q:    Oh, ok.

A:    He asked for help so he would make me do four and then he would take the rest at his discretion.

Untalan depo. at 66: 4-16.

Based on the foregoing, it is clear that Plaintiff held a bona fide executive position with Nissan as he regularly managed and directed the work of 8 to 10 individuals in the Parts Department on a daily and weekly basis.  His job description evidences that he had a leadership role within the company as he was required to supervise and motivate the staff, as well as coach and support any new and existing employees. In addition, he directed the work of the employees in the department.   His managerial duties included organizing and maintaining the parts department in an efficient layout; establishing and maintaining a system for aging special order bins; establishing and practicing measures to deter departmental theft; directing the annual physical inventory; developing and monitoring an efficient stock ordering system; ensuring the proper flow of information to the accounting department; investigating and resolving any inventory discrepancies, etc. **Exhibit I.**

As an Assistant Parts Manager, he made recommendations as to the hiring, firing, and advancement of the employees he supervised and he identified the department's training needs. Since he was authorized to conduct performance reviews and the Parts Manager sought out his opinion regarding promotions and demotions, it is evident that his was a part of upper management and held an executive status. Based on the foregoing, Plaintiff meets the job duties test for a bona fide executive employee.

### 3. Plaintiff Was Paid On A Salary Basis Of Not Less Than $455 Per Week

The second test to qualify for an exemption under Guam's Minimum Wage and Hour Act requires that Plaintiff be paid not less than $455 per week on a salary basis. There is no clear rule from Guam's local courts on how to interpret this requirement, so we must turn to the Federal Fair Labor and Standards Act[1] for guidance.

Being paid on a salary basis means an employee regularly receives a predetermined amount of compensation each pay period on a weekly, or less frequent, basis. **Exhibit J.**

When calculating the amount of salary required, 29 CFR Part 541.600 states the following:

> (a) To qualify as an exempt executive, administrative or professional employee under section 13(a)(1) of the Act, an employee must be compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities.
> (b) The $455 a week may be translated into equivalent amounts for periods longer than one week. The requirement will be met if the employee is compensated biweekly on a salary basis of $910, semimonthly on a salary basis of $985.83, or monthly on a salary basis of $1,971.66. However, the shortest period of payment that will meet this compensation requirement is one week.

Arnel Bonto is Nissan's Controller and has held this position for the past 16 years. Deposition of Arnel Bonto ("Bonto depo.") at 6: 1-2, 24-25. He testified that Nissan's employees were paid on a semi-monthly basis. Id. at 26: 12-17.

---

[1] Guam's Fair Labor and Standards Act mirrors the Federal Labor and Standard Act. Bill No. 368(EC) was signed into law as Public Law 28-164 on January 4, 2007 by then Governor Felix Camacho. The Bill was "an Act to conform the Guam Wage and Hour Law to changes in the Federal Fair Labor Standards Act regulations by amending Title 22 G.C.A. § 3108(b)." Accordingly, Guam's law is almost an exact replica of federal law, and reads as follows:
> (b)(1) Any employee who is employed in a bona fide executive capacity, which is any employee who is compensated on a salary or fee basis at a rate of not less than Four Hundred Fifty-five Dollars ($455.00) per week and whose primary duty is management of the enterprise where the employee is employed or of a recognized department thereof; who customarily and regularly directs the work of two (2) or more other employees; and who has the authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight. 22 GCA § 3108(b)(1).

Mr. Bonto testified that pursuant to the Fair Labor Standards Act, Plaintiff was considered an executive employee and was exempt from the minimum wage requirements. Id. at 27: 20-25. When asked about Plaintiff's pay structure, he indicated that Plaintiff's salary was comprised of his base pay plus commission and bonuses. Id. at 37:25, 38:1-5. He added that Plaintiff received a minimum of $455 per week (Id. at 27:13-15), and to ensure that Nissan complied with this weekly salary requirement, Mr. Bonto personally calculated Plaintiff's commissions, and then forwarded the commission calculation worksheet to Linda Nieva, Nissan's Chief Accountant, for review and processing into the payroll system. Id. at 25:9-17, 28:6-25, 29:1-7.

At $455 per week, Plaintiff should have earned a minimum of $23,660 per year. Id. at 29:8-20. During his deposition, Mr. Bonto reviewed Plaintiff's pay registers from 2007 to 2017 (**Exhibit K**, Bonto depo. 30-35) and confirmed that during those years, he earned more than $23, 660 per year, as evidenced below:

| | | | |
|---|---|---|---|
| 2007 | $27,924.28 | 2013 | $49,567.28 |
| 2008 | $39,722.93 | 2014 | $36,364.06 |
| 2009 | $42,491.36 | 2015 | $36,608.79 |
| 2010 | $46,628.21 | 2016 | $48,848.50 |
| 2011 | $44,242.11 | 2017 | $29,846,99[2] |
| 2012 | $49,093.84 | | |

When analyzing the payments from a monthly standpoint, Plaintiff received less than the minimum of $455 per week on a few occasions.

As reflected in Plaintiff's paycheck stub for pay period ending September 15, 2014, he earned wages totaling $785.19 for the work he performed during the first week of that pay period, namely September 1, 2014 through September 8, 2014. **Exhibit K and Exhibit L.** Plaintiff did not receive full payment for this pay period because he was on military orders from September 8, 2014 to September 11, 2014 and his salary was offset my his military salary. **Exhibit M**, Bonto

---

[2] Pay register for January through September 2017.

decl., ¶ 5.  He did not earn wages for the following week (September 9, 2014 to September 15, 2014) because he did no work at Nissan during that time. Declaration of Rosalinda P. Nieva ("Nieva decl."), ¶ 6, Bonto decl, ¶ 6.

However, upon receiving confirmation that Plaintiff had actually worked on September 11, 2014 and September 12, 2014 (**Exhibit N**), his wages for pay period ending on September 15, 2014 were adjusted and he received his full salary for that time period. This adjustment is reflected in his paycheck issued on October 17, 2014**. Nieva decl., ¶ 7.**

The other occasions wherein Plaintiff received less than $455 per week was during the months of February and March 2015.  **Exhibit K.**  Plaintiff's active military status from January 27, 2015 through May 3, 2015 (**Exhibit O**) and May 29, 2015 through June 17, 2015 (**Exhibit P**) affected his wages.

After the Plaintiff's pay issue in September 2014, Nissan wanted to ensure that there would be no future delays in paying him the correct salary. So, when he was placed on military orders in 2015, it was requested that he clock in an out to ensure that there were no issues regarding his salary, that he was paid in a timely manner, and that Nissan met the required threshold of $455 per week after the military offset. The need to track his work was not done for discriminatory purposes, and it was only in effect during the time he was on military orders.  This was simply a way for Nissan to confirm whether he performed work during any workweek.  At no time was Mr. Untalan ever converted to an hourly employee. Bonto decl., ¶ 8.

For pay period ending February 15, 2015, Plaintiff earned $379.05 (**Exhibit Q**) and for pay period ending February 28, 2015, he earned $586.93 (**Exhibit R**).

061832-00004

The same scenario occurred for March 2015 and for pay period ending March 15, 2015, he earned $345.84, and for pay period ending March 31, 2015, he earned $370.10. **Exhibit S and Exhibit T.**

When analyzing the payments received by Plaintiff for these months, Nissan offset his wages as he was receiving military pay. Bonto decl., ¶ 9. This is based on 29 CFR part 541.602(b)(3) which allows employers to offset wages. That code section states:

> While an employer cannot make deductions from pay for absences of an exempt employee occasioned by jury duty, attendance as a witness or temporary military leave, the employer can offset any amounts received by an employee as jury fees, witness fees or military pay for a particular week against the salary due for that particular week without loss of the exemption.

29 CFR part 541.602(b)(3).

Generally, the base salary for basic training (E1 recruit/lowest rank) is approximately $1,599 per month. When Plaintiff enlisted in the Air Force Reserves, this was his expected salary. For the month of February, if you add in his wages of $379.05 and $586.93, it totals $2,564.98, and this meets the minimum threshold for February 2015. Bonto decl., ¶¶ 10 and 11.

For the month of March 2015, if you again add in $345.84 and $370.10 to his military salary of $1,599, this totals $2,314.94, which meets the minimum threshold for March 2015. Bonto decl., ¶ 12.

In viewing the evidence and calculations presented, Plaintiff qualified as bona fide executive employee and Nissan satisfied the minimum threshold of $455 per week. Any allegations or written claims that he was an hourly employee entitled to minimum wage is not supported, and thus, Nissan is entitled to summary judgment on this issue.

11

**C.** **Nissan Is Entitled To Summary Judgment Because It Did Not Wilfully Or Recklessly Withhold Employer Contributions Into Plaintiff's 401K Plan**

Plaintiff argues that Nissan willfully or recklessly withheld his 401K benefits from his pension plan and is requesting damages. However, Plaintiff fails to prove that Nissan knowingly violated or failed to take action in reckless disregard of its obligations under USERRA such that it is entitled to summary judgment.

Plaintiff approached E.J. Quintanilla, the Human Resources Manager, regarding this matter sometime in 2017 and he requested clarification of his entitlement to employer contributions into his retirement (401K) plan while he was on military orders. At that time, Mr. Quintanilla advised him that it was his understanding that since he is not paid his entire commission if he is on leave without pay status, his overall gross income is reduced for the year and Nissan will only contribute a discretionary percentage based on that amount towards his retirement. Declaration of E.J. Quintanilla ("Quintanilla decl."), ¶ 4.

Mr. Quintanilla was later contacted by an ESGR representative regarding this issue. This immediately prompted him to seek clarification on whether Nissan was contributing directly into Plaintiff's retirement plan. Therefore, on August 30, 2017, he contacted Gaby Bamba at ASC Trust, Nissan's 401K plan administrator, for guidance. He explained to her that Nissan contributes a discretionary percentage of the employee's gross income of the preceding year towards the employee's income. He also informed her that Plaintiff's pay included commission and that he was a service member in the military. Id., ¶ 5; **Exhibit U.**

In response, Ms. Bamba advised that the employer's contribution should be based on the employee's W-2 income, with the exclusions of temporary disability insurance payments, workers compensation payments and severance payments. Accordingly, this confirmed that Mr. Quintanilla's statements to Plaintiff were correct. Id., decl., ¶ 6; **Exhibit U.**

061832-00004

However, a week later, on September 6, 2017, Ms. Bamba contacted Mr. Quintinalla via email and advised that she failed to provide him with the rules specific to military service members and USERRA. She noted in her email that she had to ask her Compliance Department for resources on this issue. Id., ¶ 7; **Exhibit U.**

She provided Mr. Quintanilla with USERRA code section 20 C.F.R. 1002.267(a) and (b)(1). Section (a) states that where the employee's rate of compensation must be calculated to determine pension entitlement, the calculation must be made using the rate of pay that the employee would have received but for the period of uniformed service. Section (b)(1) states that where the rate of pay the employee would have received is not reasonably certain, such as where compensation is based on commissions earned, the average rate of compensation during the 12-month period prior to the period of uniform service must be used. Id., ¶ 8; **Exhibit U.**

Based on this new information provided by Ms. Bamba, Nissan's Controller, Arnel Bonto, immediately proceeded to calculate the amount due to be paid by Nissan towards Mr. Untalan's 401K for the past years when he was out on military leave. A check in the amount of $1,467.39 was issued to ASC Trust to be added to his retirement plan. Id., ¶ 9.

At this time, there are no outstanding employer contributions due to Plaintiff. However, Plaintiff is still requesting damages.

Congress has provided in USERRA for an award of liquidated damages when the defendant's actions in breach of USERRA are willful. *See* 38 U.S.C. § 4323(d)(1)(C). The court in Paxton v. City of Montebello stated that "[a]lthough there are no Ninth Circuit cases discussing USERRA's liquidated damages provision, since this "provision is very similar to 29 U.S.C. § 626(b), a provision allowing liquidated damages for willful violations under the [Age Discrimination and Employment Act ("ADEA")]" Fink v. City of New York, 129 F.Supp.2d 511,

523 (E.D.N.Y. 2001); <u>Satterfield v. Borough of Schuylkill Haven</u>, 12 F.Supp.2d 423, 444-45 n. 5 (E.D. Pa 1998), the Court applied the ADEA's willfulness standard in determining whether liquidated damages were warranted. <u>Paxton v. City of Montebello</u>, 712 F.Supp.2d 1017, 1020 (C.D. Cal. 2010).

The court further stated, "[a] violation is willful under the ADEA if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. Plaintiff has the burden of proving willfulness. <u>Id.</u> at 1021. In that case, the Plaintiffs argued that the City's willfulness is shown "through the various emails and memorandums [sic] referencing the Plaintiffs military leave, and Defendants [sic] knowledge of USERRA[,]" which show the City "knew the issues surrounding Plaintiffs military leave and ... knew about USERRA." <u>Id.</u> at 1021.

However, the court held that "a violation of USERRA is not willful merely because 'the employer simply knew of the potential applicability of the [statute,]'." <u>Id.</u> It then referenced a related case, which held that "[a] finding of willfulness requires something more than merely showing that an employer knew about the [statute] and its potential applicability in the workplace." <u>Id.</u> <i>quoting</i> <u>Sanchez v. Puerto Rico Oil Co.</u>, 37 F.3d 712, 721 (1st Cir.1994). The court stated that "the e-mails plaintiffs cite show the City sought advise of counsel regarding compliance with USERRA" and that these do not establish willfulness. It further referenced <u>Reed v. Honeywell Int'l. Inc.</u>, 2009 WL 886844, which held that there is "no willfulness when the employer consulted attorneys and attempted to comply with USERRA, but made legal error as to compliance requirements." <u>Id.</u> Thus, in that case, the court found that plaintiffs had not met their burden to show the City's breach of USERRA was willful, and plaintiffs are not entitled to liquidated damages. <u>Id.</u> In a separate case, the court stated that "[t]he term "willful" as used in § 4323(d)(1)(C)

of USERRA refers to a knowing violation or action taken in reckless disregard of the obligations imposed by USERRA." <u>Fryer v. A.S.A.P. Fire & Safety Corp., Inc</u>., 658 F.3d 85,91 (1st Cir. 2011).

Here, Plaintiff has not met his burden of showing that Nissan's failure to initially provide him with the correct employer contributions into his 401K plan was willful or in reckless disregard of its obligations. In the Complaint, he simply states that "Untalan's 401K benefits were withheld from the amount that he received in his pension plan" and that "Nissan willfully or recklessly violated the rules and regulations of employee pension benefit plans under USERRA." ECF No. 1. He then alleges in his deposition that in 2017, he raised this issue with E.J. Quintanilla, and when he was informed that he was not entitled to these benefits, he filed a Complaint with ESGR. Untalan depo at 103: 8-17.

It is clear that when Plaintiff initially brought this issue to Mr. Quintanilla's attention, Mr. Quintanilla was under the good faith belief that Nissan had paid him the correct benefits and that Nissan was not violating any laws. It was only after speaking with the ESGR representative that Mr. Quintanilla was on notice that something could be awry. So, he immediately sought clarification from Ms. Bamba at ASC Trust. She first provided him with information that confirmed his stance, but then after additional research, she contacted him approximately one week later and provided him with the correct information as it relates to military service members. Upon receipt of this information, Nissan's Controller immediately calculated the amount of employer contribution due and forwarded it to ASC Trust. Per the court's holding in <u>Reed v. Honeywell Int'l. Inc.</u>, Nissan's initial error as to its compliance requirements and its consultation with ASC in an attempt to comply with USERRA is not evidence of willfulness.

There is no evidence of an intent by Mr. Quintanilla or Nissan to avoid paying Plaintiff the correct benefits into his 401K plan. Mr. Quintanilla's actions of immediately seeking clarification

on this matter refutes any arguments that Nissan acted in a willful manner or in reckless disregard to its obligations under USERRA. Since there are no outstanding 401K contributions due to Plaintiff, Nissan is entitled to summary judgment on this issue.

> **D.      Nissan is Entitled to Summary Judgment On The Claim that Plaintiff Is Entitled To Reimbursement For Medical And Dental Premiums For The Period of June 1, 2017 to July 31, 2017**

Plaintiff argues that his medical and dental insurance coverage was terminated from June 1, 2017 through July 31, 2017, that he was wrongfully charged insurance premiums for these months, and that he was never reimbursed for these deductions.

Plaintiff was on military leave from May 16, 2017 through June 28, 2017. **Exhibit V.** Accordingly, he did not receive a paycheck for pay period ending May 31, 2017, which covered the period of May 16, 2017 through May 31, 2017; pay period ending June 15, 2017, for the period of June 1, 2017 through June 15, 2017; and pay period ending June 30, 2017, for the period of June 16, 2017 through June 30, 2017. **Exhibit K.**

Due to his military leave and lack of a paycheck from Nissan, he should not have been charged semi-monthly premiums for medical benefits in the amount of $233.50 and dental benefits in the amount of $28.25 during these three pay periods. However, he failed to cancel his medical and dental coverage prior to leaving on military orders. Therefore, when he returned from duty, he was informed via email on July 17, 2017 that he owed Nissan for his continuing benefits. Quintanilla decl., ¶ 11 and **Exhibit W.**

On July 18, 2017, Mr. Quintanilla contacted Eugene Roberts at NetCare Life and Health and requested assistance as Plaintiff failed to cancel his coverage in May 2017. Quintanilla decl., ¶ 13; Declaration of Eugene Roberts ("Roberts decl."), ¶ 2. Mr. Roberts indicated that it was

061832-00004

standard protocol for an employee to cancel his or her coverage prior to leaving for military duty, and upon the employees return to work, he or she had 30 days to reenroll.  Roberts decl., ¶ 3.

Since Plaintiff's coverage was not terminated prior to his military service on May 16, 2017, Mr. Roberts agreed to retroactively cancel his coverage effective May 31, 2017, and reinstate it effective August 1, 2017.  Mr. Roberts indicated that NetCare's policy was that the cancellation of coverage occurred at the end of the month in which the employee left for military service, and upon the employee's return, if he or she reenrolled by the 20th of the month, coverage would resume at the start of the following month.  Roberts decl., ¶ 3, 4 and 5.

In this case, since Plaintiff's military leave started on May 16, 2017, his medical and dental coverage terminated on May 31, 2017. When he returned to work on July 11, 2017 and reenrolled for benefits, his medical and dental coverage resumed on August 1, 2017.  Roberts decl., ¶ 5. Plaintiff signed NetCare's change of status forms effectuating these changes on July 18, 2017. **Exhibits X**.

As a result of these changes, Plaintiff did not have to pay the premium for his medical and dental benefits for June and July 2017.  He was still, however, liable for the premiums due for pay period ending May 31, 2017 since those benefits did not cancel until the end of the month. Quintanilla decl., ¶ 15.

Mr. Quintanilla sent Plaintiff an email on July 18, 2017, which included a chart that summarized his outstanding payments for pay period ending May 31, 2017, June 15, 2017 and June 30, 2017. Since he did not receive a paycheck for these periods, he was not liable for 401K benefits.  However, he continued to be liable for the life insurance and Moylan's insurance premiums as well as the cellphone payments. Quintanilla decl., ¶ 16, **Exhibit W**

For pay period ending July 15, 2017, Plaintiff was inadvertently charged the premium for his medical and dental benefits. As reflected in the chart, these payments were deducted from the overall amount due, and his outstanding balance was reduced to $137.76. Quintanilla decl., ¶ 17, **Exhibit W.**

Mr. Quintanilla's email also included a chart for the payments due for pay period ending July 31, 2017. These payments were deducted from his paycheck for that period and were not taken into account in arriving at the $137.76 amount owed by Plaintiff. Quintanilla decl., ¶ 18, **Exhibit W.**

Upon further review of Plaintiff's claims as well as our payroll documents, Mr. Quintanilla recently noticed that the premiums for Plaintiff's medical and dental benefits were inadvertently deducted from his paycheck for pay period ending July 31, 2017. A check in the amount of $261.75 is being reimbursed to him immediately and will be mailed to his attorney's office. Quintanilla decl., ¶ 19.

The reason Plaintiff was charged premiums for medical and dental benefits for the months of June and July 2017 was because he failed to cancel these benefits prior to commencing his military orders. And as soon as he brought this issue to Mr. Quintanilla's attention, Mr. Quintanilla did his very best to assist him and they were able to work with Mr. Roberts at NetCare to adjust his benefits, which led to a significant reduction in the total amount due for benefits. Nissan has continually worked in good faith to resolve this issue and, as it stands, Plaintiff is not entitled to any additional reimbursements. Thus, Nissan is entitled to summary judgment on this issue.

## V. CONCLUSION

There is no question that Nissan did not violate Guam's Fair Labor and Standards Act, that it did not willfully or recklessly withhold employer contributions into Plaintiff's 401K plan, and

061832-00004

that it does not owe Plaintiff funds for medical and dental premiums for the period of June 1, 2017 through July 31, 2017.

Based on the arguments and the overwhelming evidence provided above, Plaintiff cannot prove that Nissan has any liability for these claims, such that these are not triable issues and Nissan is entitled to partial summary judgment.

*Respectfully submitted*: Hagåtña, GU, June 12, 2019.

CAMACHO CALVO LAW GROUP LLC

*/s/ Geri E. Diaz*
_____
GERI E. DIAZ
Attorney for Defendant
NISSAN MOTOR CORPORATION IN GUAM

## CERTIFICATE OF SERVICE

I, GERI E. DIAZ, hereby declare that on the 12th day of June 2019, I caused to be served, via the Court's CM/ECF system, a true and correct copy of the MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; CERTIFICATE OF SERVICE upon the following:

**JOHN RICHARD BORDALLO BELL**
The Law Office of John Richard Bordallo Bell
P.O. Box 315867
Tamuning, Guam 96931
671-488-1159
john.r.b.bell@gmail.com
*Attorney for Plaintiff*

DATED: Hagåtña, GU, June 12, 2019.

*/s/ Geri E. Diaz*
GERI E. DIAZ

061832-00004